# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WARREN SHAFFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 C 50111 |
| | ) | |
| WEXFORD HEALTH SOURCES, | ) | Judge John J. Tharp, Jr. |
| INC., JILL WAHL, M.D., IRENE | ) | |
| DYER, P.A., ELIZABETH | ) | |
| SMOTHERMAN, R.N., JEREMY | ) | |
| ELLIS, R.N., and | ) | |
| LYNN CHATTIC, R.N., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Warren Shafford, an inmate at Dixon Correctional Facility, tore his right pectoralis major tendon while lifting weights. Mr. Shafford brings this case under 42 U.S.C. § 1983, alleging deliberate indifference to his medical needs against four individual defendants at Dixon: one IDOC employee, Nurse Lynn Chattic, and three Wexford employees, Nurse Elizabeth Wirth, Physician's Assistant Irene Dyer, and Dr. Jill Wahl. Mr. Shafford also alleges an unconstitutional policy, custom, or practice as to Wexford Health Sources, Inc. ("Wexford"), the vendor under contract to provide medical care for the Illinois Department of Corrections. Defendant Chattic and the Wexford defendants have filed separate motions for summary judgment. The undisputed record shows that the defendants provided adequate care for Mr. Shafford's injury and, as a result, the defendants' motions for summary judgment are granted.

## BACKGROUND

### I. Northern District of Illinois Local Rule 56.1

Wexford and its employees argue that Mr. Shafford has, in various ways, failed to comply

with Local Rule 56.1. For the most part, their contentions have merit: many "facts" included in Mr. Shafford's Local Rule 56.1 Statement of Facts are more accurately characterized as "arguments;" in his Response to the Motion for Summary Judgment, Mr. Shafford routinely cites the record as opposed to his Statement of Facts; finally, in his Response to the Motion for Summary Judgment, Mr. Shafford relies upon a report by Dr. Shansky attached to, but not referenced in, his Statement of Facts. The Wexford defendants request that the Court strike all or part of Mr. Shafford's Statement of Facts and disregard all or part of his Response. Recognizing that it may demand strict adherence to the Local Rules, the Court declines to take such measures with respect to the first two errors. Instead, the Court will credit Mr. Shafford's Local Rule 56.1 statements to the extent that they state facts supported in the record. The Court will not, however, consider Dr. Shansky's report—a court-ordered report, from an unrelated case, on the state of IDOC's health care system—the inclusion of which would substantially prejudice the defendants. The lack of reference to the report in the Statement of Facts alone is a sufficient basis to exclude it. *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000) (holding that the "district court is entitled to limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements"). Further, the report was prepared solely for use in a single case and the court that commissioned the report barred its use in other cases and ordered Dr. Shansky and his assistants not to provide testimony about their work in unrelated cases. Dr. Shansky, then, is unavailable as a witness in this case and that provides an additional basis to exclude his report from consideration. Unless Dr. Shansky was made available for trial, the report would be inadmissible; and given that he is not permitted to testify regarding the contents of the report, Ex. 1, ECF No. 153-1, the evidence is not proper for consideration on this motion. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A]

court may consider only admissible evidence in assessing a motion for summary judgment.").

## II. Relevant Facts

For the period relevant to the present dispute, Mr. Shafford, aged 59, was incarcerated at Dixon Correctional Center in Dixon, Illinois. Wexford Defs.' Statement of Facts ("Wexford DSOF") ¶ 1. On the morning of October 6, 2014, Mr. Shafford saw defendant Nurse Wirth (née Smotherman) through the Nurse Sick Call line. He informed her that, at his last appointment, he had forgotten to ask his physician for a renewal of his Motrin pain medication and also requested a permit for medical writs so that he could wear his New Balance tennis shoes and heel cup when he left the prison. *Id.* ¶ 6.[1] In response, Nurse Wirth added Mr. Shafford to the MD Sick Call line and from there he was scheduled for a visit on October 18. *Id.* ¶ 8. Unfortunately, his next interaction with the health care unit came much sooner than that.

Directly after his visit with Nurse Wirth, Mr. Shafford went to the prison yard to lift weights. *Id.* ¶ 10. While performing a bench press of approximately 250 pounds, Mr. Shafford "heard a snap and felt pain and a tingling sensation on his right side near his chest." *Id.* When informed of Mr. Shafford's injury, the correctional officers on duty called a "Code 3" and a van transported Mr. Shafford back to the health care unit.[2]

---

[1] Although claims were brought against Nurse Wirth, Mr. Shafford has since conceded that she had no part in his medical care. *See* Pl.'s Mem. Opp. Wexford Defs.'s Mot. Summ. J. at 3, ECF No. 142 ("As noted in Wexford's filings, R.N Wirth did not treat Plaintiff for the should injury he sustained. This fact is undisputed."). Accordingly, Shafford's claim against Nurse Wirth is not addressed in this opinion and a judgment in Wirth's favor will be entered.

[2] Mr. Shafford claims, and the Wexford defendants dispute, that the call was coded an "emergency." *See* Wexford Defendants' Response to Plaintiff's Statement of Facts (Wexford Defs.'s Resp. PSOF) ¶ 1. Although Mr. Shafford describes the call as a "Code 3" in his deposition, Shafford Dep. 19:7-11, ECF No. 146-2, the "emergency" portion of the description is based entirely on Mr. Shafford's complaint, which cannot serve as a basis for genuine dispute of fact on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the

3

When Mr. Shafford returned to the health care unit, he initially spoke with defendant Nurse Chattic, an IDOC employee, and explained his weightlifting injury. Def. Chattic's Statement of Facts ("Chattic DSOF") ¶ 15. Mr. Shafford alleges, and Nurse Chattic disputes, that Chattic told him that there was nothing wrong with him and went back over to her colleagues and laughed with them about something. Chattic's Resp. Pl.'s Statement of Facts ("Chattic Resp. PSOF") ¶ 3. There is no dispute, however, that this brief interaction was the extent of Nurse Chattic's involvement with Mr. Shafford "throughout the course of [Mr. Shafford's] injury." Pl.'s Statement of Facts Def. Chattic ("PSOF Chattic") ¶ 5. Roughly fifteen minutes later, Mr. Shafford was seen by an unidentified[3] second nurse who, according to the medical records, noted an injury from lifting weights and gave Mr. Shafford a 10-day gym and yard restriction. Chattic DSOF ¶ 15.

Two days later, on October 8, Mr. Shafford returned to the health care unit complaining of pain in his shoulder. Wexford DSOF ¶ 12. He saw defendant Nurse Jeremy Ellis, who examined Mr. Shafford's shoulder and gave him ibuprofen for his pain.[4] *Id.* Another two days later, on October 10, Mr. Shafford came to the health care unit for an appointment with defendant Physician's Assistant Irene Dyer. *Id.* ¶ 13. During the visit, Mr. Shafford described his weightlifting injury and reiterated his previous unrelated requests (a renewal of his Motrin and a permit to wear his New Balance shoes). *Id.* ¶ 14. With respect to his shoulder injury, Mr. Shafford reported that "it seemed like his deltoid was disconnected from his shoulder" and that he could not

---

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'").

[3] Mr. Shafford initially testified that Nurse Wirth (a Wexford employee) attended to him, Shafford Dep. 27:15–29:7, ECF No. 146-2. During briefing, however, Mr. Shafford admitted that Nurse Wirth was not involved. Pl.'s Resp. Wexford DSOF ¶ 11.

[4] Unfortunately, defendant Ellis passed away during the pendency of this case. Judge Kapala granted Mr. Shafford's motion to voluntarily dismiss Ellis from the lawsuit on March 8, 2018. ECF No. 148.

4

lift his meal tray with his right hand. *Id.* Upon examination, P.A. Dyer found that the shoulder was tender to palpation and noted a "reddish, purplish bruise" at Mr. Shafford's upper right chest. *Id.* ¶ 15. P.A. Dyer also observed that, though it caused him pain, Mr. Shafford had full range of motion in his shoulder and his hand. *Id.* ¶¶ 15-16. P.A. Dyer ordered x-rays and instructed Mr. Shafford to rest, apply ice and compression, and elevate his shoulder and prescribed him Motrin for pain relief. *Id.* ¶¶ 17-18.[5]

Ten days later, on October 20, Mr. Shafford visited the health care unit again, reporting that "he was in a lot of pain and had not had his shoulder x-rayed," but he did not receive treatment that day. Pl.'s Statement of Facts Wexford Defs. (PSOF Wexford) ¶ 5.[6] Eleven days after that, on October 31, he returned and saw P.A. Dyer to review the x-rays, but the x-rays had yet to be performed. *Id.* ¶ 19. P.A. Dyer conducted another physical examination of Mr. Shafford, noting that he was not in "acute distress," but also observing a "soft, bulging tissue on his right chest." *Id.* ¶ 20. P.A. Dyer assessed Mr. Shafford with "shoulder pain, wrist pain, hand pain, and a chest mass." *Id.* To deal with Mr. Shafford's continued pain, P.A. Dyer prescribed a stronger medication, Nanoproxen, for two months as needed. *Id.* ¶ 21. P.A. Dyer also wrote new orders for x-rays of Mr. Shafford's entire right arm—his shoulder to his hand—and requested a second opinion regarding his condition. *Id.* Before leaving the health care unit, Mr. Shafford received a sling,

---

[5] Mr. Shafford disputes this description—he states that he does not remember receiving care instructions, Pl.'s Resp. Wexford DSOF ¶ 17—but a failure to remember is not sufficient to "raise a genuine issue of material fact," especially in light of the contrary medical records and P.A Dyer's affidavit. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 736 (7th Cir. 2002).

[6] The Wexford defendants dispute this assertion—or more precisely, they dispute that the assertion is supported by the evidence cited by Mr. Shafford. *See* Wexford Defs' Resp. PSOF Wexford ¶ 5. They are correct: the details of Mr. Shafford's medical record are found in Ex. 3, not Ex. 4, of Mr. Shafford's Statement of Facts. *See* PSOF Wexford Ex. 3, ECF No. 146-3 at 22. The Court, however, chooses to ignore Mr. Shafford's mis-citation and finds that any dispute as to substance by the Wexford defendants is not well-founded.

5

which he wore as much as possible because it alleviated his pain. *Id.* ¶ 22. On November 3, P.A. Dyer saw Mr. Shafford again, noting that he had recently been to KSB Hospital—a local hospital in Dixon, Illinois—to undergo the x-rays she had ordered. *Id.* ¶ 27.

On November 10, Mr. Shafford saw defendant Dr. Jill Wahl for a second opinion. *Id.* ¶ 23. Although Dr. Wahl was employed by Wexford as a traveling medical director, she was stationed full-time at Dixon Correctional Center at this time.[7] Dr. Wahl examined Mr. Shafford and noted that he had a "defect at the insertion of his right pectoralis with a bulge at the pectoralis muscle" and decreased range of motion. *Id.* ¶ 24. Dr. Wahl assessed Mr. Shafford with a possible tear of his pectoralis and planned to request an orthopedic evaluation and a follow-up in two weeks. *Id.* Two days later, Dr. Wahl held a collegial review with Dr. Ritz, a Wexford physician, and received approval to send Mr. Shafford to a UIC orthopedist in the next 4-6 weeks. *Id.* ¶¶ 25-26. For the interim period, Dr. Wahl and Dr. Ritz discussed referring Mr. Shafford to physical therapy, which Dr. Wahl did that same day. *Id.* ¶ 26.

A week later, on November 17, P.A. Dyer saw Mr. Shafford to review his x-rays. *Id.* ¶27. Although the x-rays had been completed, they were not yet in P.A. Dyer's chart, so she told Mr. Shafford to continue current treatment and ordered that he return for a follow-up once she had

---

[7] Mr. Shafford alleges that Dr. Wahl did not treat plaintiff until November 10 "due to the fact that Wexford employs Wahl as 'a traveling site medical director' who splits her time between *twenty-one* different prisons," PSOF Wexford ¶ 9 (emphasis original), and that "because Dr. Wahl only spends 27.03% of her time at Dixon, this significantly extended Plaintiff's treatment timeline." *Id.* ¶ 10. The Wexford defendants object to these statements. First, they properly dispute the causal claims as argumentative and speculative. Second, they argue that the purely descriptive portions are misleading as framed. After reviewing the record, the Court agrees. Dr. Wahl was employed as a traveling medical director from 2007-2015. PSOF Wexford Ex. 7 at ¶ 3. During that period, Dr. Wahl spent time at 21 different facilities, including Dixon where she spent 27.03% of her time. *Id.* ¶ 4. At least as it relates to Dixon, however, the record indicates that she distributed her time sequentially rather than contemporaneously: she worked at Dixon from approximately August 2013 to March 2015 and, while stationed there, worked at the prison full-time and did not work at any other prisons. Defs.' Resp. PSOF Wexford Ex. F ¶ 3.

6

them. *Id.* ¶ 28. The x-rays arrived later that day and Mr. Shafford returned two days later to review them. *Id.* ¶¶ 29-30. The x-rays showed no evidence of an acute fracture in the shoulder, wrist, or hand, but all the joints showed mild degenerative changes. *Id.* ¶ 31. At this follow-up, Mr. Shafford reported that the bulge on his shoulder had been drooping for two days. *Id.* ¶ 31. P.A. Dyer assessed Mr. Shafford with shoulder, chest, wrist, and hand pain and a shoulder mass and referred him to the medical director for further treatment. *Id.* ¶ 32.

On December 2, Mr. Shafford returned for a follow-up with Dr. Wahl, who examined Mr. Shafford and told him that his pectoralis major tendon was disconnected from his deltoid. *Id.* ¶ 33. She informed Mr. Shafford of the treatment plan developed at collegial review: begin physical therapy and see an orthopedic surgeon in 4-6 weeks. *Id.* ¶ 34. In the following weeks, both parties took steps to execute the plan: Mr. Shafford attended physical therapy once or twice a week for approximately a month, *Id.* ¶ 35, and Dr. Wahl returned to collegial review on December 10 and suggested that Mr. Shafford be sent to a local orthopedic surgeon given the backlog at UIC. *Id.* ¶ 36. Dr. Wahl's suggestion was approved and on December 16 she discussed the updated plan with Mr. Shafford. *Id.* ¶¶ 36-37. During this visit, Mr. Shafford reported left cheek spasms and pain and Dr. Wahl instructed him to seek treatment through Nurse Sick Call. *Id.* ¶ 37.

The next day, December 17, Mr. Shafford traveled to KSB Hospital—where he had received his x-rays—to see Dr. Thomas Hernandez, an orthopedic surgeon.[8] After an examination, Dr. Hernandez assessed Mr. Shafford with a chronic pectoralis major tendon tear, ordered an MRI, and instructed him to stop using his sling and to begin daily physical therapy. *Id.* ¶¶ 38-39.[9] Five days later, Mr. Shafford had a post-specialist follow-up with Dr. Wahl. *Id.* ¶ 40. During the visit,

---

[8] Dr. Hernandez is not a defendant in this case.

[9] A chronic tear is one that is more than 6-8 weeks old. Hernandez Dep. 59:10-12, ECF No. 123-5.

7

Dr. Wahl discussed the plan for daily physical therapy with Mr. Shafford and ordered an MRI and a follow-up with Dr. Hernandez. *Id.* On December 31, collegial review denied the follow-up with Dr. Hernandez pending evaluation of the MRI results. PSOF Wexford ¶ 16.

Three days later, on January 2, 2015, Mr. Shafford underwent an MRI of his right shoulder. Wexford DSOF ¶ 41. Five days after that, with Mr. Shafford unavailable due to a prison lockdown, Dr. Wahl reviewed the MRI report. *Id.* ¶ 42. On January 13, Dr. Wahl discussed the MRI with Mr. Shafford and informed him that she would request a follow-up with Dr. Hernandez. *Id.* ¶ 43. The next day, Dr. Wahl received signoff from collegial review, and, on January 21, Mr. Shafford returned to KSB Hospital. *Id.* ¶¶ 44-45. Dr. Hernandez reviewed the MRI results and conducted a physical exam, noting that Mr. Shafford's "axillary fold—the front of his armpit—was asymmetric and 'balled up' medially." DSOF Wexford ¶ 46. Affirming his prior assessment, Dr. Hernandez diagnosed Mr. Shafford with a "chronic pectoralis tendon rupture with significant retraction." *Id.* Dr. Hernandez also explained the benefits and drawbacks of surgical repair of the pectoralis tendon tear. *Id.* ¶ 45. Mr. Shafford alleges, and the Wexford defendants dispute, that Dr. Hernandez's deposition testimony establishes that surgery is, on average, less successful for chronic tears. *See* Defs.' Resp PSOF Wexford ¶¶ 20-23, 25. Despite the chronic nature of his tear, Mr. Shafford elected to undergo surgery and returned to KSB on January 27 to discuss necessary preparations. DSOF Wexford ¶ 47.

After a pre-operative evaluation on February 11, Mr. Shafford underwent surgery to repair his torn pectoralis major tendon on February 17. *Id.* ¶ 50. The operation, performed by Dr. Hernandez, went smoothly. *Id.* After surgery, Dr. Hernandez instructed Mr. Shafford to use a sling except when showering or at physical therapy and requested that he follow up in two weeks. *Id.* That same day, Mr. Shafford saw Dr. Wahl to review Dr. Hernandez's instructions and discuss a

post-surgical management plan. *Id.* ¶ 51. Among other things, Mr. Shafford would be temporarily transferred to the prison's infirmary and would receive regularly scheduled pain medication and antibiotics. *Id.* ¶ 52. Soon thereafter, Mr. Shafford began physical therapy, attending twice a week for a period of six weeks. *Id.* ¶ 53.

A few weeks later, on March 6, Mr. Shafford saw P.A. Dyer regarding complaints of "facial contraction and numbness." *Id.* ¶ 55. Upon examination, P.A. Dyer found that he was not in acute distress and noted that the surgical staples were undamaged. *Id.* ¶ 56. In response to Mr. Shafford's complaints, she upped his dosage of Naprosyn, planned to submit a referral for the UIC neurology clinic, and planned for him to follow up in 10 to 14 days. *Id.* ¶ 57.

Three days later, on March 9, Mr. Shafford returned for a post-op appointment with Dr. Hernandez, who noted that the repaired pectoralis tendon was intact. *Id.* ¶ 58.[10] Dr. Hernandez gave Mr. Shafford updated post-surgery instructions and told him to return in three to four weeks. *Id.* ¶ 59. In line with Dr. Hernandez's recommendation, Mr. Shafford returned to KSB Hospital on April 15, at which point his pain was well-controlled and he was, according to Dr. Hernandez, doing "amazingly well" in his recovery. *Id.* ¶ 60. Despite his smooth recovery, Mr. Shafford had—and will always have—a "cosmetic defect" related to his injury. Pl.'s SOF Wexford ¶ 33.[11] A few weeks later, on May 4, Dr. Hernandez saw Mr. Shafford for a third post-op appointment. Mr. Shafford reported that he fell on his right arm, but Dr. Hernandez evaluated him and found that "the repair was still intact and there was no obvious evidence of re-rupture." DSOF Wexford ¶¶ 61-

---

[10] The parties disagree about Mr. Shafford's reported pain-level this appointment. The Wexford defendants allege that Mr. Shafford "was doing fine and his pain was improved." DSOF Wexford ¶ 58. Mr. Shafford disputes this, responding that he was "still experiencing varying pain levels from two to ten at any given time." Pl.'s Resp. DSOF Wexford ¶ 58.

[11] The parties dispute whether the existence of this cosmetic default can be causally attributed to the length of time it took to schedule and perform Mr. Shafford's surgery. Defs.' Resp. PSOF Wexford ¶ 33.

62. Dr. Hernandez reported that Mr. Shafford's progress was "par for the course" and instructed him to continue physical therapy. *Id.* ¶ 62.

On July 17, P.A. Dyer saw Mr. Shafford for the last time. *Id.* ¶ 62. P.A. Dyer noted that Mr. Shafford's shoulder was tender to palpation. *Id.* Mr. Shafford also reported numbness and tingling in his right thigh. P.A. Dyer prescribed Motrin 800 mg three times per day as needed for two months and referred Mr. Shafford to the prison's medical director for further assessment of the numbness. *Id.* Roughly nine months later, on April 4, 2016, Mr. Shafford filed this lawsuit.

## DISCUSSION

Summary judgment is appropriate only if the defendants show that there is "no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law." *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court construes "all facts and makes all reasonable inferences in favor of the non-moving party." *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). Nonetheless, to show that a material fact is disputed, the party "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). In § 1983 cases, "the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Padula v. Leimbach,* 656 F.3d 595, 600 (7th Cir. 2011).

The Eighth Amendment, as incorporated through the Fourteenth Amendment, requires prison officials to "provide inmates with medical care that is adequate in light of the severity of

10

the condition and professional norms." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). To state an Eighth Amendment claim under § 1983, Mr. Guerrero must show that "he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately indifferent, that is, subjectively, indifferent." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quotation marks and citation omitted). Because no party disputes that Mr. Shafford suffered from an objectively serious medical condition, the Court turns to the second element.

Deliberate indifference is a more demanding standard than medical malpractice or negligence, requiring "a sufficiently culpable state of mind" such that a prison official "knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Although the test for deliberate indifference is a subjective one, "[m]ost cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc), as amended (Aug. 25, 2016). In proceeding this way, claims against medical professionals must overcome deference to medical expertise: "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)). Courts have found minimal competence lacking where medical officials "provided [ ] 'blatantly inappropriate' treatment, ignored the recommendation of a specialist, or needlessly delayed [an inmate's] treatment (and thereby increased his pain)." *Stewart v. Wall*, 688 F. App'x

11

390, 392 (7th Cir. 2017) (quoting *Perez*, 792 F.3d at 777).

Nurse Chattic is the defendant that Mr. Shafford encountered first, and least frequently, during his course of treatment. The totality of Mr. Shafford's interactions with Nurse Chattic occurred on October 6 immediately after he returned from the prison yard. Even taking Mr. Shafford's disputed version of the events as true—that after he explained his injury, she told him there was nothing wrong with him and returned to laughing with her colleagues—Nurse Chattic's response does not constitute deliberate indifference. When assessing claims of deliberate indifference, "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Here, Mr. Shafford does not dispute that he was examined by another nurse within fifteen minutes. Because Mr. Shafford's injury was painful but not life-threatening, his fifteen-minute delay falls well-within the "tolerable." Indeed, it is a rare that one does not have to wait fifteen minutes to see a doctor.[12] *See Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) ("Anyone who has ever visited a doctor's office knows that some delays in treatment are inevitable, particularly absent a life-threatening emergency. Such delays are even more likely in the prison environment.").

Given the voluntary dismissal of Nurse Ellis, P.A. Dyer is the next defendant that Mr. Shafford saw during his course of treatment. P.A. Dyer provided treatment to Mr. Shafford on numerous occasions. And while the "receipt of some medical care does not automatically defeat a claim of deliberate indifference," *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), a detailed account of treatment received can be persuasive in rejecting such a finding. *See Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017) (finding that the record as a whole foreclosed a finding of

---

[12] The fact that Mr. Shafford did not receive pain medication or other ameliorative treatment after examination by the unidentified nurse is not relevant to the claim against Nurse Chattic.

deliberate indifference where medical officials conducted multiple examinations, took x-rays, and referred plaintiff to a specialist). Further, the evidence indicates that P.A. Dyer provided competent medical care on each occasion. When she saw Mr. Shafford for the first time on October 10, four days after his injury, she prescribed pain medication and ordered x-rays. At every subsequent visit, P.A. Dyer responded reasonably, providing updated care to both his new and unchanged symptoms. For example, upon his return visit, she strengthened his prescribed pain medication and, in light of the "chest mass" that replaced his pectoral bruise, she referred him to Dr. Wahl for a second opinion. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("Even if a defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

Perhaps recognizing as much, Mr. Shafford does not explicitly challenge the reasonableness of P.A. Dyer's treatment decisions. Instead, he alleges deliberate indifference based on her failure to facilitate timely receipt and review of the x-rays she ordered at the initial October 10 visit. *See* Pl.'s Resp. Mot. Summary Judgment at 5-6. In particular, he argues that P.A. Dyer's failure to make sure the x-rays were ordered and performed prior to the October 31 follow-up appointment constituted deliberate indifference. But Mr. Shafford has failed to meet his burden of proof in two ways. First, he has not produced evidence indicating that P.A. Dyer consciously disregarded the risk of delay. According to P.A. Dyer's uncontradicted testimony, it was not her job to verify that the order was entered or that the x-rays were performed—the Wexford nurses generally took care of scheduling and execution. *See* Wexford DSOF ¶ 70; Wexford DSOF Ex. C ¶¶ 26, 30. And there is certainly no evidence to suggest that P.A. Dyer was indifferent as to whether the x-rays were taken; her continued efforts to obtain and review them belie such a claim. As a result, it was "at most negligent" for her not to check on a process that she expected to run smoothly

13

without her. *See Williams v. Guzman*, 346 F. App'x 102, 105 (7th Cir. 2009) ("With no evidence that the doctors knew about the note and deliberately disregarded it, failure to review the nurse's note is at most negligence, which is insufficient to establish deliberate indifference."); *see also* Wexford DSOF Ex C ¶ 26.

Even if P.A. Dyer was aware of the issue, Mr. Shafford has failed to produce evidence showing that the delay in getting the x-rays "caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm."). In fact, the medical records make clear that the failure to complete the x-rays did not delay Mr. Shafford's treatment and therefore could not have caused him harm. On October 31, even without the x-rays, P.A. Dyer referred Mr. Shafford to Dr. Wahl for a second opinion. On November 10, still without the x-rays, Dr. Wahl determined that Mr. Shafford likely had a torn pectoralis tendon and should see an outside specialist. Finally, notwithstanding the continued absence of x-rays, Mr. Shafford's visit to an outside specialist was approved in collegial review on November 12.[13] No reasonable factfinder could conclude that the unavailability of the x-rays on October 31 (or thereafter) harmed Mr. Shafford.

Mr. Shafford also alleges deliberate indifference against Dr. Wahl, setting out two theories. First, Mr. Shafford argues that Dr. Wahl's status as a traveling medical director contributed to an unconstitutional delay in his treatment. *See* Pl.'s Mem. Opp. Wexford Defs.'s Mot. Summ. J. at 7

---

[13] The lag between this approval (November 12) and Mr. Shafford's eventual visit to see Dr. Hernandez (December 17) is attributable to the plan developed in collegial review (visit a specialist in 4-6 weeks) and difficulties in scheduling (a backlog at UIC), not insufficient diagnostic tests (such as x-rays).

14

("Wexford employed Dr. Wahl as a traveling medical director to oversee *twenty-one* different prisons. Because of this, Dr. Wahl did not see Plaintiff until November 10, 2014, *thirty-five days* after his injury on October 6, 2014."). The basis for Mr. Shafford's contention is a response to an interrogatory by Wexford indicating that, during her tenure with Wexford, Dr. Wahl served in 21 hospitals. *See* PSOF Wexford Ex. 7 at 2-3, ECF No. 146-7. Even if Mr. Shafford's interpretation of this statement were accurate,[14] it would not support a finding of deliberate indifference with respect to Dr. Wahl. A staffing insufficiency is relevant to a claim against the party responsible for staffing—here, Wexford—but it is not relevant to a claim against an individual employee.

Mr. Shafford also takes issue with Dr. Wahl's treatment decisions, alleging that, despite seeing Mr. Shafford on several occasions, she provided "perfunctory medical appointments wherein no meaningful treatment was dispensed." Pl.'s Mot. Summary Judgment (quoting *Perez*, 792 F.3d at 777). Specifically, Mr. Shafford argues that after noting a "possible" pectoralis tendon tear on his first visit, Dr. Wahl should have expedited surgery. But Dr. Wahl's chosen course of care—pursing conservative treatment through physical therapy and pain medication while seeking a second opinion prior to ordering an MRI—did not constitute deliberate indifference. First off, even assuming that delay in surgical intervention negatively impacted the efficacy of the procedure, there is no evidence that Dr. Wahl knew of or recklessly disregarded this risk. Without such evidence, the allegation boils down to a "complaint that a physician has been negligent in . . . treating a condition," which "does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

---

[14] As discussed *supra* note 7 and assessed below with respect to Mr. Shafford's claim against Wexford, Mr. Shafford's allegation lacks support in the record: Dr. Wahl provided an additional declaration clarifying that, while she was stationed at Dixon, she worked only at Dixon and did not travel between facilities. *See* Defs.' Resp. PSOF Ex. 1, ECF No. 149-1.

Moreover, the decision not to immediately pursue surgery was not objectively unreasonable because surgery was not required in this case. According to Dr. Hernandez, the only specialist on record, patients in Mr. Shafford's age demographic often go without surgery, opting for more conservative treatment. Hernandez Dep. 14:10–15:4, ECF No. 123-5 ("[B]eing 55, 56, which I think is what he was when I first saw him, he was also kind of at the borderline of whether you have to do anything about it. A lot of it is cosmetic at that point."). Dr. Hernandez stated that whether the tear is acute or chronic, "[i]t's not unreasonable to not do surgery, and it wouldn't be unreasonable to do surgery." *Id.* at 104:14-16 Therefore, there is no basis on which to rebut the deference owed to Dr. Wahl's treatment decisions. *See, e.g.*, *Whiting*, 839 F.3d at 663 (affirming grant of summary judgment on deliberate indifference claim where "no expert testified that [defendant's] chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony"). Further, because an entirely non-surgical treatment plan was reasonable, Mr. Shafford's disputed contentions that delay made surgery more difficult to perform and decreased the likelihood of a complete recovery are beside the point. Mr. Shafford was ultimately afforded the option of surgery—which he took—but he was not entitled to it: "an inmate is not entitled to demand specific care and is not entitled to the best care possible, he is entitled to reasonable measures to meet a substantial risk of serious harm." *Arnett*, 658 F.3d at 754.

More generally, Dr. Wahl's record of treatment "reflects a level of continuous care that is not consistent with a malicious state of mind." *Lloyd*, 721 F. App'x at 494. Dr. Wahl facilitated conservative treatment while also seeking a referral for a second opinion. When it appeared that UIC would be unable to accommodate Mr. Shafford within the desired 4-6 week time horizon, Dr.

16

Wahl petitioned for, and received, an alternative referral to a local hospital. The record forecloses a finding that Dr. Wahl's thorough and responsive treatment was "perfunctory."

The final defendant in the case is Wexford. To prevail on a deliberate indifference claim against Wexford, Mr. Shafford must show that an official Wexford policy, practice, or custom caused the constitutional violation. *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (stating that *Monell* liability "applies in § 1983 claims brought against private companies acting under color of state law"). Although the Court has found that Mr. Shafford has no claim against the individual defendants, Wexford may still be liable if its "institutional policies are themselves deliberately indifferent to the quality of care provided." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc).

On the present record, Mr. Shafford has not marshalled evidence capable of supporting a finding of liability.[15] As in his claim against Dr. Wahl, Mr. Shafford argues that the use of a traveling medical director caused predictable delays and breakdowns in treatment. But Mr. Shafford has adduced no evidence to support this claim; one could state with equal resort to unsubstantiated possibility that use of a traveling medical director would promote consistency and quality control across Wexford's facilities. As noted above, Mr. Shafford's argument is based almost entirely on Wexford's response to an interrogatory indicating that, during her tenure with Wexford, Dr. Wahl served in 21 hospitals. *See* PSOF Wexford Ex. 7 at 2-3, ECF No. 146-7. From this statement, Mr. Shafford draws the inference that Wexford was understaffing its hospitals, forcing one medical director to cover 21 separate locations. A follow-up declaration by Dr. Wahl, however, severely undermined this interpretation and, with it, Mr. Shafford's claim. Dr. Wahl clarified that she did not serve at 21 hospitals concurrently. Defs.' Resp. PSOF Ex. 1, ECF No.

---

[15] As noted *supra* note 1, the Court will not consider the Shansky Report as evidence.

149-1. Rather, over her eight years as a traveling medical director with Wexford, she rotated between hospitals. As relevant here, when she was stationed at Dixon from April 2013 through March 2015, she worked only at Dixon. *Id.* Therefore, there is no genuine dispute of material fact that Dr. Wahl's classification as traveling medical director did not cause her to be unavailable and could not have caused the delays that Mr. Shafford attributes to it. Because Mr. Shafford has identified no other policy relevant to his claim, no reasonable factfinder could deem Wexford liable.

\* \* \* \* \*

The gravamen of Mr. Shafford's complaint is that a delay in surgically repairing his torn pectoralis tendon resulted in a non-optimal recovery. Although Mr. Shafford's lingering symptoms are unfortunate, Mr. Shafford's claim fails because non-surgical treatment was reasonable in this instance and the specific treatment that defendants provided Mr. Shafford while exploring the possibility of, and eventually providing, surgery was adequate over the entire period. Within about two months of his injury, and after being assessed and treated by several nurses, a physician's assistant, and a doctor, Mr. Shafford was referred to an outside specialist, an orthopedic surgeon, who deemed the initial course of treatment Mr. Shafford had received to be reasonable and who continued that course of treatment for another two months until Mr. Shafford could be scheduled for surgery. This record does not describe deliberative indifference to Mr. Shafford's injury or objectively unreasonable treatment. Accordingly, the defendants' motions for summary judgment are granted.[16]

---

[16] The Court thanks counsel for the plaintiff, Michael D. Carter, Jr. and Michael T. Wierzbicki, Jr., whom the Court recruited to represent Mr. Shafford and who have ably represented him throughout this case.

Dated: March 19, 2020

John J. Tharp, Jr.
United States District Judge